LAZARE POTTER GIACOVAS & MOYLE LLP
747 Third Avenue, 16th Floor
New York, New York 10017
Telephone (212) 758-9300
Facsimile: (212) 888-0919
Attorneys for Petitioner,
Michael J. Egan

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

MICHAEL J. EGAN,                                    Civ. No.

                     Petitioner,          **PETITION TO CONFIRM**
                                          **ARBITRATION AWARD AND**
                                          **FOR ENTRY OF ORDER**
                                          **DIRECTING EXPUNGEMENT**

     v.

BARRY E. LOUGHRANE REVOCABLE
TRUST,

                     Respondent.

-------------------------------------------------------------x

       Petitioner, Michael J. Egan ("Egan" or "Petitioner"), by and through his attorneys of

record, Lazare Potter Giacovas & Moyle LLP, alleges as follows:

**NATURE OF THE PROCEEDING AND RELIEF SOUGHT**

       1.     Petitioner commences this proceeding to confirm an arbitration award (the

"Award") issued in the Financial Industry Regulatory Association ("FINRA") arbitration

proceedings captioned *Barry E. Loughrane Revocable Trust v. Lincoln Financial Advisors Corp.*

*and Moors & Cabot, Inc., FINRA Case No. 19-03215* (the "Arbitration") to have judgment

entered thereon and issuance of an Order directing the expungement of the Arbitration and the

claims made by Claimant, Barry E. Loughrane Revocable Trust (the "Trust") through its

Trustees, Barry E. Loughrane ("Barry") and Andrew D. Loughrane ("Andrew"; collectively the

"Trustees"), from Egan's record in the Central Registration Depository ("CRD") system, pursuant to Section 9 of the Federal Arbitration Act, 9 U.S.C. § 9.  A copy of the Award, dated November 5, 2021, is attached as <u>Exhibit A</u> hereto, and incorporated by reference herein.

## PARTIES

2.      Michael J. Egan is an individual and FINRA registered representative, CRD No. 2124653, domiciled in the State of Florida.

3.      On information and belief, the Trustees are individuals representing the Trust, which was created in New York, and are domiciled in New York.

## JURISDICTION AND VENUE

4.       This Court has subject matter jurisdiction to confirm an arbitral award in favor of a party pursuant to 28 U.S.C. § 1331(a) because this is an action under Section 9 of the Federal Arbitration Act, 9 U.S.C. § 9 to confirm an arbitration award.

5.      Venue is proper in this Court pursuant to 9 U.S.C. § 9 since the claims of Respondent were submitted to FINRA's Northeast Regional Office located at One Liberty Plaza, 27th Floor, New York, NY, 10006 and the administration of the Arbitration, including issuance of the Award all occurred within the New York Regional Office.

## BACKGROUND

6.      On October 25, 2019, the Trust filed a Statement of Claim against Lincoln Financial Advisors Corporation ("LFA") and Moors & Cabot, Inc. ("M&C"), alleging several claims arising out of a series of Variable Pre-Paid Forward Contracts ("PPFs") the Trustees had entered into from 2011 to 2019 (<u>Exhibit B</u>). Accompanying the Statement of Claim was an executed FINRA Submission Agreement (<u>Exhibit C</u>).

7.     All FINRA registered representatives and member firms are required to submit to FINRA's jurisdiction over any claims brought by a customer, and vice versa. The Submission Agreement is a FINRA requirement for any claims filed and reflects each party's acknowledgment of FINRA's jurisdiction over them and their agreement to submit their disputes to FINRA for arbitration.

On February 3, 2020, LFA and M&C filed their respective Answer and Third-Party Claim against the Trust's and Trustees' personal broker and financial advisor, Paul Majane ("Majane") (Exhibit D and E). LFA filed an executed Submission Agreement (Exhibit F) on February 6, 2020, and M&C followed suit on June 24, 2020 (Exhibit G). Majane filed his Answer to LFA and M&C's Third-Party Claims on March 19, 2020 (Exhibit H), and his Submission Agreement the same day (Exhibit I).

8.     In its Statement of Claim, the Trust alleged claims of breach of fiduciary duty, violation of FINRA Rules; breach of contract; negligence/gross negligence; and common law and statutory fraud.

9.     In their Answers, LFA and M&C denied all of the Trust's allegations and asserted a number of affirmative defenses, including Andrew's own breach of the fiduciary duty he owed to the Trust. They also asserted Third-Party Claims against Majane for indemnification and contribution for his breach of fiduciary duty to the Trust as the personal broker and financial advisor to the Trust and its Trustees. M&C also sought expungement on behalf of Egan, a member of the M&C team that transacted the PPFs complained of by the Trust. Although Egan was not personally named in the Statement of Claim, his employer reported the Trust's claim on Egan's FINRA Form U5, and the claim appears on Egan's BrokerCheck report, which is available to the public by running a search on the FINRA website (Exhibit J).

10.     The PPFs at issue were entered into by the Trustees on behalf of the Trust as a means to diversify its investment portfolio, which was heavily concentrated in a single stock, Omnicom ("OMC"). According to the Direct Business Application that Barry completed at the time of the first transaction, Barry had thirty years of investment experience. Barry disclosed that the Trust had a liquid net worth of $6 million and an annual income of $120,000. Notably, Barry indicated that the Trust's investment objective was "growth" and its risk tolerance was "aggressive", with an "intermediate" investment time horizon of four to ten years.

11.     This PPF strategy is utilized for clients who, like the Trust, are interested in generating tax-deferred liquidity from their hedged stock position. Through its structure, similar to a collar, the client keeps ownership of the stock, but essentially puts the stock up as collateral for a loan from the bank on the other side of the transaction, equaling the current value of the stock minus costs.

12.     A PPF reduces the downside price risk and allows continued participation in stock gains, and can be structured so that the client will not incur *any* out-of-pocket expenses—that *includes* any fees earned by M&C (and LFA or Majane) for its services in brokering the transaction. All costs come out of the amount charged by the bank for making the loan and setting up the put and call options. It was M&C's role to shop for the best rate for the client from its existing relationships with participating banks, which it did for the Trust prior to each transaction.

13.     M&C had a team that specialized in PPFs, of which Egan was a member (the "Team").

14.     LFA had been bringing clients in similar positions as the Trust to M&C since about 1996. When a client is referred by a broker to M&C, it is for the sole purpose of

developing a single stock risk management strategy—that was the sole specialty (and role) of the Team. As such, as far as the Team knew, and as their subsequent telephone conversations confirmed, the PPF strategy had already been discussed with the Trustees as the best option for the Trust and Barry's needs.

15.     In fact, over the course of almost two years prior to the first transaction and prior to ever speaking to either of the Trustees, the M&C Team was contacted several times by Brendan O'Connor, Barry's financial advisor at LFA ("O'Connor") and Majane seeking pricing on potential PPF transactions for the Trust. As the Team understood it, O'Connor and Majane were counseling Barry regarding his over-concentration in OMC stock. Working with M&C was the option that Barry eventually decided upon as the best one, as it provided him with substantial cash up front. M&C did not know what Barry wanted the cash for, just that this was an important aspect of his decision on behalf of the Trust.

16.     However, in order for a PPF transaction to work as designed, it is incumbent upon the stock owner to take the "loan" proceeds and invest them in a diverse portfolio with a higher return rate than the cost of the PPF transaction. Eventually, the "loan" must be paid back.

17.     Barry and Majane did no such thing. Instead, they invested the loan proceeds in an annuity that only paid a 4 percent return, and began losing value from day one. As such, there was no available cash to pay back the loan each time it came due, and the Trust, with Majane's counsel, continued to roll over each transaction for several years.

18.     At the same time, OMC's stock price continued to rise. By January 2019, Andrew and Majane made the decision to stop rolling the transaction over, and instead used the OMC stock to pay off the loan by transferring ownership to the bank.

19.     As a result, as alleged by the Trust, it was subject to a tax bill of approximately $500,000 in capital gains, which it claimed as "losses" in the Statement of Claim. The Trust also claimed as "losses" the amount lost on the PPF transactions themselves, based on the rise in OMC stock as compared to the price at which they entered into the first PPF transaction. It is these "losses" the Trust sought to recover from LFA and M&C.

20.     Contrary to the Trust's allegations, the PPF transactions were absolutely suitable for sophisticated investors who had their own financial advisor (Majane, who earned commissions from the annuity and each PPF transaction he recommended to the Trust) such as the Trustees had, they met every one of the Trust's very specific investing goals, and M&C was in no way responsible for the Trustees' investment decisions, as it had no advisor-customer relationship with them. Additionally, at the time of each transaction, Barry and/or Andrew signed and acknowledged that they understood the risk of the PPF transactions and had consulted with their own tax advisors and attorneys prior to entering into them.

21.     Prior to the hearing in the Arbitration, the parties participated in FINRA mediation and settled the Trust's claims. On May 20, 2021, the parties informed FINRA of the settlement, but M&C requested that the matter remain open so that Mr. Egan could move forward with his claim for expungement of his CRD record.

22.     On September 16 and 23, 2021, the three-arbitrator Panel conducted a telephonic hearing on Egan's expungement, at which he testified on his own behalf.

23.     Both Andrew on behalf of the Trust, and Majane participated in the hearing and although they did not object to Egan's claim for expungement, Majane objected to certain evidence presented and Andrew testified on the Trust's behalf.

24.     LFA did not participate.

25.     On November 5, 2021, FINRA issued the Panel's Award, which granted Egan's request for expungement (Exhibit A). In it, the Panel made specific findings regarding Egan's culpability for the Trust's alleged losses.

26.     Pursuant to FINRA Rule 12805, the Panel made the following Rule 2080 affirmative findings of fact: "the registered person was not involved in the alleged investment-related sales practice violation, forgery, theft, misappropriation, or conversion of funds." (Exhibit A, p. 4).

27.     After deliberation, and based on the pleadings, the settlement agreement, Egan's BrokerCheck report, Mr. Egan's testimony and proffered exhibits, the Panel determined that all requirements for expungement of the Trust's claims under Rule 2080 had been met. Specifically, the Panel determined:

> Through testimony and documentary evidence, the party requesting expungement established to the satisfaction of the Panel that: (1) the Statement of Claim mentioned both an employee of Respondent Lincoln Financial and Mr. Majane, but neither Mr. Egan nor anyone else at Respondent Moors & Cabot as having engaged in wrongdoing or misleading Claimant; (2) uncontroverted testimony of Mr. Egan established that Claimant was referred to and brought to Mr. Egan, an employee of Respondent Moors & Cabot, by its own financial advisors including Mr. Majane for the purpose of executing a very specific financial transaction to cure the overconcentration of Claimant's investments and to provide liquidity to Claimant; (3) documentary evidence support Mr. Egan's assertion that he and Respondent Moors & Cabot had a limited and specific role to play in the investment at issue, and that they did not have access to the full picture of Claimant's financial portfolio and financial status; (4) Claimant admitted in testimony that Mr. Egan was on multiple telephone calls with Claimant to explain each investment and answer questions; (5) Mr. Majane was Claimant's financial advisor of more than 40 years and was fully familiar with Claimant's entire financial history, portfolio and goals and recommended Respondent Moors & Cabot, after conducting research into which firms had expertise in the investment strategy already decided upon; and (6) Mr. Egan and Respondent Moors & Cabot were

> simply "middle men" executing on directives from a well-informed and sophisticated customer who had financial advisers, lawyers and accountants at its disposal to guide and advise Claimant on the full consequences of the investment at issue, in light of Claimant's entire financial portfolio and objectives. As a result, the Panel declines to support Claimant's effort to hold Mr. Egan responsible for not knowing or taking into account information that was never disclosed to him or Respondent Moors & Cabot.

(Exhibit A, p. 4-5).

28.     On November 12, 2021, Egan sought permission from FINRA to waive FINRA's Rule 2080 requirement that the agency be named as a party to all petitions seeking judicial confirmation of arbitration awards containing expungement relief. FINRA granted Egan's request on December 20, 2021 (Exhibit K).

29.     Egan now moves this Court to confirm the Panel's November 7, 2021 Arbitration Award, issue an Order directing the CRD to expunge his record, and enter judgment on his behalf.

## CLAIM FOR RELIEF
### (Confirmation of the Award Under 9 U.S.C. § 9)

6.      The Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.*, govern this Award, because the Award arises from a contractual relationship that involves commerce and contains an arbitration provision. 9 U.S.C. § 2.

7.      This Court has jurisdiction to confirm the Award against the Trust.

8.      This petition is being filed within one year after the Award was made, as required by 9 U.S.C. § 9.

9.      The Federal Arbitration Act provides that upon application by any party to the arbitration agreement for an order confirming the award, "the court *must* grant such an order

unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title." 9 U.S.C. § 9 (emphasis added).

10.     None of the grounds available for vacatur, modification or correction of an award specified in Sections 10 and 11 of the Federal Arbitration Act should be applied to the Award.

11.     Therefore, the Award should be confirmed pursuant to 9 U.S.C. § 9.

WHEREFORE, Petitioner respectfully requests an order:

1.     Confirming the Award and entering judgment in favor of Petitioner and against Respondent in accordance with the Award;

2.     Issuing an Order directing the CRD to expunge Michael J. Egan's record; and

3.     Granting such other and further relief as the Court deems just and proper under the circumstances.

Dated: New York, New York
          January 18, 2022

LAZARE POTTER GIACOVAS
& MOYLE LLP

By:     /s/ Lainie E. Cohen
          Lainie E. Cohen
          lcohen@lpgmlaw.com
          747 Third Avenue, 16th Floor
          New York, New York 10022
          (212) 758-9300

          *Attorneys for Petitioner*
          *Michael J. Egan*