# EXHIBIT B

**BEFORE FINRA DISPUTE RESOLUTION**

| | |
|---|---|
| *In the Matter of the Arbitration Between*<br><br>Barry E. Loughrane Revocable Trust<br><br>                              Claimant,<br>         - against -<br><br>Lincoln Financial Advisors Corp., Moors & Cabot Inc.,<br><br>                              Respondents. | **STATEMENT OF CLAIM**<br><br>FINRA No. 19- |

Claimant The Barry E. Loughrane Revocable Trust (the "Trust"), through its Trustees Barry E. Loughrane and Andrew D. Loughrane, through their undersigned attorneys, bring this action against Respondents Lincoln Financial Advisors Corp. ("Lincoln") and Moors & Cabot Inc. ("Moors"), **(collectively "Respondents").**

The Trust was created in New York and the trustees are residents of New York, and request that the arbitration hearing on the merits for this matter take place in New York City, NY.  The Trust seeks to proceed under FINRA's expedited arbitration procedures because of Trustee Barry E. Loughrane's senior age of 87 years and declining health.

**INTRODUCTION**

The Trust brings this action to recover damages caused by the misrepresentations, omissions, failure to supervise, breach of fiduciary duty, breach of contract, fraud, aiding and abetting fraud and violation of securities laws and industry rules perpetrated by Respondents.

After a long career in advertising from which he retired in 1988, Barry E. Loughrane ("Mr. Loughrane") accumulated a concentrated position in a company he founded in 1986 with others through mergers of longstanding companies, Omnicom Group (OMC), a public company and global leader in marketing communications.

1

Not surprisingly, Mr. Loughrane held a concentrated amount of OMC acquired over many years. Resultingly, there were both investment and tax consequences to manage, for which Mr. Loughrane looked to advisors for assistance. Mr. Brendan O'Connor, who at the time and historically managed Mr. Loughrane's insurance needs, contacted Moors & Cabot on behalf or Mr. Loughrane to setup a meeting regarding Mr. Loughrane's concentrated stock holding. Moors & Cabot had an entire professional department dedicated to this issue: The Single Stock Risk Management Group. Thereafter, Mr. Loughrane attended a meeting with Mr. O'Connor and Moors & Cabot, where they introduced the concept of a product called a Prepaid Variable Forward Contract ("PPVFC") to Mr. Loughrane.

The PPVFC was pitched as a tax avoidance strategy that would help Mr. Loughrane legally avoid taxes, protect the underlying position and inure to the Trust's benefit, but just the opposite was true of the PPVFC. With no consideration of what was suitable, misleading upfront disclosures, and opaque ongoing statements, as well as no exit strategy, Mr. Loughrane was persuaded to make the investment after a long period of sales pressure. Ultimately, there was no tax benefit, no upside potential and a lot of fees and expenses. The investment essentially ate itself alive and was lost – despite the stock position increasing in value from $1.2 million to $2.7 million. Moreover, not only were the tax benefits never realized, the tax burden was in fact increased and exacerbated at his advanced age. Even though the value of Mr. Loughrane's position in OMC doubled, the only parties that made any money on the PPVFC were the brokerage firms.

As a result of the forgoing, the Trust lost not less than $1,486,278.29 net from the investment and incurred approximately $520,000 in unnecessary taxes on the increased price of the concentrated position that the Trust never received, as well as lost opportunity.

## THE PARTIES

**I.   TRUST**

**1.  The Barry E. Loughrane Revocable Trust**

The Barry E. Loughrane Revocable Trust was set up in 2010 to manage Barry E. Loughrane's assets and estate as he was advancing in age. The trustees are Barry E. Loughrane and Andrew D. Loughrane, his son ("Andrew"). Mr. Loughrane was a career advertising professional and a founder of Omnicom as described above. Andrew began his career in the early eighties in asset management. Twenty-seven (27) years ago, in 1992, Andrew began focusing on real estate and related insurance products, which he has done ever since. Neither Mr. Loughrane nor Andrew had any experience with PPVFC investments before the subject investment. Andrew did not learn of the investment until after it was already made.

Barry E. Loughrane was 77 years old when the investment was made, 87 today. Mr. Loughrane had experience with equities and a portfolio of approximately $10 million to $13 million, but was not a sophisticated market or tax professional.

**II.   Respondents**

**A.   Lincoln Financial Advisors Corp**

Respondent Lincoln is a FINRA registered broker-dealer with its main office at 1300 S. Clinton St., Ft. Wayne, Indiana. Per its CRD, Lincoln has 14 regulatory events, as well as 6 arbitrations, all relating in one way or another to supervision. Lincoln, through Mr. O'Connor, held itself out as having an expertise in tax avoidance strategies.

3

**B.     Moors & Cabot, Inc.**

Respondent Moors & Cabot is a FINRA registered broker-dealer with its main office located at 1 Federal Street, Boston, Massachusetts. Per its CRD, it has had 28 regulatory matters, 3 arbitrations and 2 bond actions, mostly relating to supervision. Moors & Cabot held itself out as having an expertise in single stock management, having an entire department called the Single Stock Risk Management Group. Moors & Cabot with Lincoln recommended the investment and established all the counterparty relationships.

**III.    Third Parties**

**A.     Wells Fargo Securities LLC**

Respondent Wells Fargo Securities is a FINRA registered broker-dealer with its main office at 550 S. Tryon St., Charlotte, North Carolina. Per its CRD, it has 141 regulatory matters and 1 civil action. Per Moor's and Cabot's Structure, Wells was both the brokerage firm holding Mr. Loughrane's stock, as well as the counterparty – a conflicted relationship.

**B.     Paul Majane at Source Capital**

Paul Majane was Mr. Loughrane's financial advisor and friend for over 40 years. He worked at Source Capital Group, Inc., when this investment was originally made. Source Capital Group, Inc. is defunct and not registered as a result of a large arbitration award that is unpaid. Mr. Majane suggested Mr. Loughrane speak to Mr. O'Connor about his concentrated position to manage tax and other issues. Mr. Majane did not hold himself out as having tax or single stock management specialization, as Moors & Cabot and Lincoln did hold themselves out.

## STATEMENT OF FACTS

I.     **Omnicom Concentrated Position**

    A.     **Background on Omnicom**

Omnicom Group Inc. is an American global media, marketing and corporate communications holding company, headquartered in New York City. Omnicom's branded networks and specialty firms provide services in four disciplines: advertising, customer relationship management, public relations and specialty services. Omnicom is a low beta stock listed on the NYSE, meaning it is relatively stable in price. Mr. Loughrane, with others, founded it in approximately 1986.

    B.     **What Is a Prepaid Variable Forward Contract and What Did Mr. Loughrane Have?**

Prepaid variable forward contracts are typically used by corporate executives who accumulate a substantial position in a company they have founded or led, because a concentrated position has risk, they need effective ways to diversify their wealth. Often it is used because they are prohibited from selling their shares, or at a minimum, and it doesn't look good when they do, especially during volatile periods. Neither of these reasons applied to the Mr. Loughrane and the Trust, who had no prohibition on selling and had other effective ways to diversify his wealth.

The prepaid variable forward contract is supposed to be designed to synthetically add diversification or pass the financial risk to another party. Technically, it is a collar strategy, which is a bundled long put option and short call option on a security, with a third element: the monetization of the transaction in the form of the loan against the underlying security. To an average investor, it is a complex and heavily paper-laden investment. In Mr. Loughrane's case, the PPVFC did not add diversification and he retained the lion's share of the financial risk – which he realized.

In a PPVFC, the investor receives an up-front payment (typically, 75-85% of the stock's market value) in exchange for delivery of a variable number of shares or cash in the future. The contract establishes floor and threshold prices that govern how many shares (or cash equivalent) are returned at a given market price. Theoretically, the investor should be protected against downside risk below the floor while enjoying appreciation potential up to the threshold. That is not the case in the investment Mr. Loughrane had through Lincoln and Moors and Cabot, which provided only a roughly 5% upside potential with significant risk of loss.

PPVFCs mature and <u>typically</u> last 3-4 years, with a 1-3% annual cost,[1] and can usually roll over. The investor still earns dividends and any other benefits of holding the position, but essentially have given the position as collateral in a complicated loan-like transaction. Once in a PPVFC, getting out can be expensive and difficult. In Mr. Loughrane's case, he was increasingly given unfavorable terms in what was essentially contracts of adhesion aggressively every six months instead of every 3-4 years. With no exit strategy at the outset and at the age of 77, Mr. Loughrane became trapped in the investment until it essentially ate itself alive.

## II. Wrongful Conduct

### A. Heightened Duties to a Trust

This transaction was solicited by Moors & Cabot, in conjunction with Lincoln Financial, to a Trust, to which heightened duties attach. *Lerner v. Fleet Bank*, 459 F.3d 273 (2d Cir. 2006); see also *Royal Park Invs. SA/NV v. HSBC Bank USA, N.A.*, 109 F. Supp. 3d 587, 602-03 (S.D.N.Y. 2015). Both institutions knew that the Trust was conservative and designed to manage a concentrated position and for estate purposes.

---

[1] Note, the Trust's fees and expenses were far higher, as will be described below.

6

**B. Misleading Recommendation of an Unsuitable Product**

It is not the responsibility of the customer to determine when an investment is suitable, it is the brokerage firm's responsibility only to recommend suitable investments based on truthful statements.

At 77 with looming estate and tax issues, Mr. Loughrane owned a substantial and concentrated position in OMC stock. The OMC stock was not restricted and he had no obligations to the company. Without Andrew (who did not know about the investment for some time), and as described above, it was recommended to Mr. Loughrane that a PPVFC could help him legally avoid taxes and diversify a concentrated position of OMC stock. That was a false representation in the recommendation of an unsuitable position. Taxes could only be deferred, not avoided and the concentration persisted as a risk (ultimately realized) to the Trust.

The Trust received approximately 78% of the value of the OMC to get into the PPVFC, approximately $1.18 million, which was put into a (conservatively) 4% fee taxable annuity with limited liquidity (with contingent deferred sales charges), which was worth approximately 70% of its per dollar value on day one. The Trust then paid, on average, 6-7% a year for the structure.

It would make no sense to recommend to Mr. Loughrane, or for him to accept (if it was properly described to him), a PPVFC to diversify and avoid taxes on the OMC stock for the following reasons:

(1) There was no driving tax issue;

    a. Without tax avoidance, it made more sense for Mr. Loughrane to sell his position earlier in favor of a diverse pool of other growth stocks and/or bonds, but he was never told this;

> > i. Mr. Loughrane had no restrictions on sale and no obligations to the company to hold the stock, as well as other OMC stock and no emotional attachment to the position;

(2) It would have been cheaper to sell the position and diversify his equities;

> a. when the price was lower, it made more sense to take on the 15% Long Term Capital Gain Tax, the (conservatively) 6% state tax and 3% local lax (24% total), than to pay the 22% to a brokerage firm on the hypothetical loan, for a PPVFC that would cost 6-7% annually (in 13 years roughly 21%) PLUS the fees and costs of the taxable annuity (easily 4%, as well as a reality of only 70% of every dollar actually invested retaining value after fees, costs and lock-up). On every level, this recommendation made no sense on a cost basis;
> 
> b. Moreover, as the position increased, so did the tax burden on Mr. Loughrane, who now owes taxes on $2.7 million, or roughly $520,000, which upside he was never permitted to enjoy. The PPVFC made no sense on a tax basis either;

(3) The PPVFC did not cure the concentration issue in the OMC stock;

> a. As structured, the concentration issue was never really dealt with. Mr. Loughrane still experienced the downside of concentration, in fact, the structure made the concentration worse: Mr. Loughrane only benefited when the stock went down, unable to enjoy any upside potential on the position. Only the brokerage firm could win on this "fixed-hand" investment;

(4) The structure took a liquid asset of a senior citizen and made it illiquid, as did the recommendation of an annuity. This investment made no sense for a senior's estate.

8

When the investment was recommended, Mr. Loughrane understood that he still owned the stock, but it was collateral and was given no exit strategy. The fees, costs and lost opportunity, as well we the floor and ceiling pricing were not adequately described in a balanced and fair - in fact, some of these elements were not described at all. Verbal discussions conflicted with written disclosures, making the longstanding trust relationships with his advisor Mr. O'Connor paramount to Mr, Loughrane, as well as confusing.

Mr. Loughrane was not told that there would be issues holding it for any given length of time. Likewise, as it automated and rolled over, he was never given meaningful choice on what should be done with the position or when, he received no meaningful options. The PPVFC was grossly unsuitable for the trust of a long retired senior in his mid-70s.

The ongoing recommendations from the outset through the last contract were egregious enough, but the way the trade was managed was quite far off the reasonableness standard required by FINRA's Rule 2010 good faith and fair dealing requirements to "observe high standards of commercial honor and just and equitable principles of trade." The parties never fully explained the methodology of floor/ceiling pricing, income, costs and fees, or how it would affect his position and taxes going forward. There was no good-faith basis for the recommendation, except for the brokerage firms' willingness to exploit a senior citizen with plum stock holding from a lifetime of hard work.

**C. Ongoing Excessive and Unnecessary Fees and Costs**

Mr. Loughrane tried to understand the fees and costs, but disclosures, statements, confirmations and requests for information were met with opaque responses and documents that did not fulfill the FINRA solicitation requirements.

The PPVFC made no sense for Mr. Loughrane and never should have been recommended, but it was to make easy money for the brokerage firms – not putting the Trust's best interests first, as the fiduciaries should have done. Not only was the VPPFC a high cost way of doing halfway what needed to be done completely with his position, i.e., diversifying a historically low-beta concentrated position, but VPPFC contracts are typically 2-3 year contracts that average a cost of 1-3% (½%-1% per annual contract). Mr. Loughrane's transactions were 6 month contracts averaged 6-7% costs annually, (2.7% to 4.2% per 6 month contract). A 6 month contract is unusual, as well as that the terms of this deal depart from industry standards and norms by roughly 5-6% annually. On top of that, Mr. Loughrane paid large fees and costs associated with a taxable annuity as well.

Even at the end of the transactions, the parties were unable to explain the methodology of pricing, income, costs and fees This highlights that not only did Mr. Loughrane fail to understand the transactions, but the people that sold it to him did not understand the transaction either and the disclosures were inadequate all around.

### D.  Ongoing Negligence and Omissions

Moors & Cabot was required to "establish" appropriate parameters for the transactions at each new contract to assess and advise on the efficacy of continuing, but no one ever suggested an exit or provided meaningful advice, despite having a purported "specialization" it held out to the public and a department it called the "Single Stock Risk Management" group. The risk was in no way managed, in fact, the risks was increased through these transactions. The structure was a commission event.

Despite providing no relevant or useful advice, roughly $1 million in fees and income were collected between the brokerage firms. Then, to try to pillage Mr. Loughrane further, at the

last roll-over transaction before the investment imploded and ate itself alive, Mr. Loughrane was told to save the $2.7 million position in OMC, he would have to either pay $2.7 million to keep the position or put up his other $3.5 million in shares in a new incomprehensible, complex structure – an idiotic recommendation.

### E. Senior, Trust and Estate Issues Ignored

A PPVC in the trust of an elderly man made a liquid asset illiquid and hard for an estate to unwind, if he passed on, did recommendation of an illiquid and costly taxable annuity, which could have been achieved much more cheaply. Given Mr. Loughrane was retired and well beyond his primary earning years, there was no driving tax reason to spend the exorbitant amounts these transactions in haircuts, commissions and fees. Moreover, the taxes he ultimately must pay are 40% higher than if he had simply sold and diversified, i.e., had he not been strung along in this nonsensical series of opaque and adhesive transactions, where he had no bargaining power. Every participant to this transaction except Mr. Loughrane understood this transaction made no sense, but no one offered him that truthful information. Instead, each participant took advantage of his lack of understanding of the transaction.

Unsophisticated in PPFC and caught in what became a "no exit" scenario, the Trust was deprived meaningful choice and oppressive one-sided terms. *Maybank v. BB&T* Corp., 416 S.C. 541 (Sup. S.C. 2016)(involving pre-paid variable forward contract), citing, *Simpson v. MSA Myrtle Beach, Inc.*, 373 S.C. 14 (2007). The VPPFC made no sense for the Trust, it met no goals of the trust and was imbalanced. Moreover, the 10% put/call collar made no sense as the transaction progressed, but the trust was a proverbial "deer in the headlights" with nowhere to reasonably go. FINRA's many mandates outlined in Notices to Members and Regulatory Notices require special care when dealing with seniors, but were completely ignored.

**F. Conclusion**

While not a typical, run of the mill case at FINRA, causes of action involving a PPVFC have been successful in arbitrations in the past, both in settlements and awards. *Calvin Brown Memorial Trust et al. v. Citigroup Global Markets and Morgan Stanley,* FINRA Case # 12-02242 (July 9, 2015); *LiVolsi v. Merrill Lynch*, NASD Case # 03-03208 (August 16, 2004); and *Rowland v. Merrill,* FINRA Case # 10-02338, (September 2, 2011). Mr. Loughrane was falsely promised this would be a tax avoidance investment for the Trust, but it actually worsened the Trust's position at every level.

There was no reasonable justifiable reason to sell a PPVFC to a trust or an elderly man and Respondents knew it, but participated in the ongoing sales process to generate its own fees and commissions, with no meaningful disclosures on how the PPVFC worked in its entirety in simple language. Although many documents say the transaction was done under Regulation D, there was no offering document. As the transaction ate itself alive over the years with a 7% annual burn, the investment eventually went to zero and the only way to salvage the $1.2 million investment was to put another $3.5 million into the structure. The PPVFC took over $1.4 million in profits away from Mr. Loughrane, who got stuck holding the bag on the taxes.

By the time the account was closed in January 2019, the Trust had paid about a million dollars to brokerage firms for the pleasure of losing at a minimum $1,486,278.29 with a estimated tax bill of $520,000.00.

## CAUSES OF ACTION

I. **FIRST CAUSE OF ACTION:**
   **BREACH OF CONTRACT; VIOLATION OF INDUSTRY RULES**

Trust entered into written oral and implied contracts with Respondents. Respondents is a member of FINRA and is subject to FINRA's Conduct Rules; as such, Respondents was obligated to provide services to Trust in conformity with those rules. Respondents failed to abide by industry rules, including but not limited to:

   a. FINRA Conduct Rule 2110 (members shall observe high standards of commercial honor and just and equitable principles of trade); and

   b. FINRA Conduct Rule 2210 (written and oral sales materials for products must present a fair and balanced picture of both benefits and risks).

   c. FINRA Conduct Rule 2111 requires that a firm or associated person have a reasonable basis to believe a recommended transaction or investment strategy involving a security or securities is suitable for the customer. This is based on the information obtained through reasonable diligence of the firm or associated person to ascertain the customer's investment profile. Failure to diversify, over-concentration, is a form of a suitability violation.

II. **COMMON LAW AND STATUTORY FRAUD: AIDING AND ABETTING**

Respondents acted as a co-conspirator to the fraud perpetuated on the Trust. Respondents had the responsibility to not falsely portray the transactions benefits, upon which they understood Mr. Loughrane relied. Allowing the investment to be sold and continue to roll over under the guise of legitimacy, Respondents each participated in and/or aided and abetted the fraudulent scheme.

The conduct of the Respondents constituted a willful violation of FINRA Rules. Respondents had the responsibility to not effect any transaction in, or induce the purchase or sale of, any such scheme without policies and procedures in place relevant thereto, by means of any manipulative, deceptive or fraudulent device or contrivance; and engaged in acts, practices and courses of business which operated as a breach of such responsibility.

Respondents, directly and indirectly, through the use of the mails and other means and instrumentalities of interstate commerce and in connection with the purchase and sale of securities, knowingly, willfully and recklessly:

a. made untrue statements of material facts upon which the Trust relied and did omit to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;
b. employed manipulative, deceptive and fraudulent devices, schemes, and artifices to defraud the Trust; and
c. engaged in acts, practices, and a course of conduct that operated as a fraud and deceit upon the Trust in the purchase of PPVFCs.

The Trust justifiably relied upon all statements and representations made to them by Respondents as to their expertise and their ability to service the Trust in a profitable manner. Facts regarding the manner in which their investments were handled and the risks associated with the investments were misrepresented and omitted.

Here, Respondents knew Mr. Loughrane was relying upon them. Such conduct was the direct and proximate cause of damages to Trust.

### III. BREACH OF FIDUCIARY DUTY

Heightened duties attach to management and review of trust accounts. *Lerner v. Fleet Bank*, 459 F.3d 273 (2d Cir. 2006); see also *Royal Park Invs. SA/NV v. HSBC Bank USA, N.A.*, 109 F. Supp. 3d 587, 602-03 (S.D.N.Y. 2015). Respondents owed Trust a fiduciary duty, and that duty was breached, for the reasons described above. Respondents, as Trust's agents, owed a

common law fiduciary duty of care, a duty of loyalty, a duty to account, a duty of obedience, and a duty of disclosure as well as a duty to act in the highest good faith toward their public customer. Under applicable principles of New York Agency Law, an agent does not have title to a principal's property and is subjected to the control of the principal. Moreover, "[s]ecurities dealers owe a special duty of fair dealing to their clients." *SEC v. Hasho*, 784 F. Supp. 1059, 1107 (S.D.N.Y 1992).

Respondents had an obligation to Trust but instead operated for their own personal benefit to Trust's detriment.

*Aiding and Abetting Breach of Fiduciary Duty*

Respondents induced and/or participated in the breach of a fiduciary duty to Trust. Accordingly, Respondents aided and abetted the breach of that fiduciary duty. As a result, Respondents are liable to Trust for the losses incurred. *See*, *Kaufman v. Cohen*, 307 A.D.2d 113 (1st Dep't 2003).

IV. **NEGLIGENCE/GROSS NEGLIGENCE**

  a. **Negligence**

As registered FINRA members, Respondents had the duty to abide by the FINRA Rules in servicing Trust's accounts. Industry rules, including those of FINRA and the SEC, set forth the standard of care used by securities industry professionals and the duty of care owed by Respondents to Trust. *Remington v. Newbridge Sec. Corp.*, 2013 U.S. Dist. LEXIS 79082, at *18-19 (S.D. Fla. June 5, 2013) (citing *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cheng*, 697 F. Supp. 1224, 1228 (D.D.C. 1988) (stating that broker dealers are under "a duty to act in

accordance with the standard of care used by other professionals in the community."); *see also, Miley v. Oppenheimer & Co. Inc.*, 637 F.2d 318, 333 (5th Cir. 1981).

Respondents owed Trust a duty of care and failed to act accordingly. Failure to abide by and comply with SEC, FINRA, and other regulatory rules may provide evidence of breach of the duty of care owed to customers by a broker dealer.

The burden of proving good faith is placed upon Respondents and the various control persons, and thus, at a minimum, Respondents must establish that there was no negligence in their supervision. *Marbury Mgmt., Inc. v. Kohn*, 629 F.2d 705, 716 (2d Cir. 1980), *cert. denied*, 449 U.S. 1011 (1980). Entities and persons who control the broker dealer are held liable under the Exchange Act, Section 20(a). Furthermore, FINRA Rule 3110 specifically requires firms to adopt and comply with procedures concerning transmittals of customer funds, which include a means of customer confirmation, notification, and determining the authenticity of the transmittal instructions.

Here, Respondents have the burden to establish that there was no negligence in its supervision and that it a) has a system of reasonable supervision and b) complied with it. By virtue of the foregoing conduct of Respondents, Respondents failed to supervise Trust's accounts and violated FINRA and other industry rules and are liable for the same. As a result thereof, Respondents are liable for any resulting losses suffered by the Trust.

**b. Gross Negligence**

Under New York law, misconduct that rises to the level of gross negligence must show "reckless indifference to the rights of others." The conduct must show a "failure to use even slight care or conduct that is so careless as to show complete disregard for the rights and safety of others." The gross negligence standard focuses on the severity of a party's deviation from

reasonable care. By virtue of the foregoing conduct of Respondents, Respondents were recklessly indifferent to the rights of Trust, failing to act and/or notify Trust or put a stop to the misconduct, despite having knowledge of the questionable activity/entities/individuals/securities involved. As a result thereof, Respondents were grossly negligent and are liable for any resulting losses suffered by Trust.

### c. GBL Section 349

The above conduct violates New York General Business Law § 349(a) which declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service." The statute provides a private right of action to any person injured by the deceptive acts or practices committed by a business. *Id*. at § 349(h). Respondents' omissions and misrepresentations were deceptive and thus unlawful under § 349.

## DAMAGES

### I. COMPENSATORY DAMAGES

Trust reserve the right to modify their requested damages at hearing, but request no less than $1,486,278.29 in net losses and approximately $520,000 in unnecessary taxes.

### II. INTEREST

Alternatively, rather than the well-managed portfolio theory of damages, Trust seek interest on the value of the money invested as an element of compensatory damages at the legal rate compounded from the date of filing the Statement of Claim, or however the Panel deems appropriate.

**III.     FORUM FEES AND COSTS**

There is simply no contractual basis for Trust to be liable for forum fees and costs. Trust' submission of these claims to FINRA Dispute Resolution, as they are contractually obligated to do, does not constitute an agreement to pay or share in any forum fees that were undisclosed at the time they executed an agreement that contained an arbitration clause.

**IV.     ATTORNEYS/EXPERT WITNESS FEES**

An arbitrator's authority to grant legal fees is well recognized. *See, e.g., Synergy Gas Co. v. Sasso*, 853 F.2d 59 (2d Cir. 1988), *cert. denied*, 488 U.S. 994 (1988). In addition, it has been consistently held that where the Uniform Submission Agreements of each of the parties incorporate the Trust's Statement of Claim, if the Statement of Claim requests attorney's fees, it constitutes the agreement of the parties to empower the arbitrators to decide the issue of attorneys' fees. *See, e.g., First Interregional Equity Corp. v. Haughton*, 842 F.Supp. 105 (S.D.N.Y. 1994); *U.S. Offshore, Ltd. v. Seabulk Offshore, Ltd.*, 753 F.Supp. 86 (S.D.N.Y. 1990).

In this case, counsel for Trust represents to the Tribunal that the fee agreement will be provided to the Panel at the hearing in this matter. It is no longer necessary for counsel to submit a statement setting forth the hours spent and rate of compensation. *See Goldberger v. Integrated Resources, Inc.,* 209 F.3d 43, 50 (2d Cir. 2000).

**V.     PUNITIVE DAMAGES**

By reason of the Respondents' unconscionable acts and wilful misconduct, breaches of industry rules and fiduciary duties to Trust, Trust are entitled to recover compensatory damages and punitive damages. The misconduct in the account was perpetrated in such a gross, reckless, wanton and wilful manner as to be deserving of the imposition of punitive damages.

## WHEREFORE

As a result of Respondents' actions detailed herein, Trust respectfully request that the Panel:

(a) Award not less than $1,486,278.29 in compensatory damages;

(b) Award well managed theory damages in an amount to be proven;

(c) Award interest, arbitration fees, costs and expenses including attorney and expert fees, and punitive damages; and

(d) grant such other and further relief as the Arbitration Panel deems just and proper under the circumstances.

Dated: New York, New York
October 21, 2019

MALECKI LAW

By: _____
Jenice L. Malecki, Esq.
11 Broadway, Suite 715
New York, New York 10004
(212) 943-1233 Telephone